In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2908

DAMON GOODLOE,

*Petitioner-Appellant,*

*v.*

CHRISTINE BRANNON,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-02650 — **Sara L. Ellis**, *Judge.*

ARGUED SEPTEMBER 15, 2020 — DECIDED JULY 12, 2021

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* An Illinois jury convicted Damon
Goodloe of first degree murder in the death of Pierre Jones.
After losing his direct appeal and all post-conviction proceed-
ings available in state court, Goodloe petitioned for a writ of
*habeas corpus* in federal court under 28 U.S.C. § 2254. After the
district court denied relief on all of his claims, this court

granted a certificate of appealability on his claim that evidence was admitted at his trial in violation of the Confrontation Clause. We later expanded that certificate to include his assertion that his trial counsel provided ineffective assistance. We now affirm the district court's denial of *habeas* relief.

## I.

We presume that the factual findings of the state court are correct for the purposes of *habeas* review unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Goodloe has not provided clear and convincing evidence rebutting the state court findings and so we defer to the state court's version of events. *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018). Shortly before 2 a.m. on December 24, 2002, police officers Joseph Hodges and Jason Venegas responded to a call of "shots fired" near 113th Street and South Edbrooke Avenue in Chicago. On arriving at the scene, the officers found Pierre Jones on the ground, bleeding from a gunshot wound to the leg. Officer Hodges called for an ambulance as two additional officers, Ronald Bialota and Michael Martinez, arrived at the scene. It was then 1:58 a.m. Officer Bialota asked Jones who shot him, and Jones replied, "Damon shot me." Jones also told the officers that Damon was wearing a "black hoodie."

Officers Hodges and Venegas remained with Jones while Officers Bialota and Martinez searched for the offender. Approximately a minute and a half later, Bialota and Martinez encountered Goodloe coming out of an alley near 114th Street and Prairie Avenue, just a few blocks away from the scene of the crime. Goodloe was wearing a black hoodie under a jacket,

but was not armed. After initially telling the officers that his name was Mario, Goodloe produced identification revealing that his first name was Damon. Within minutes, the officers brought Goodloe back to the scene, where paramedics were working on Jones in the back of an ambulance. Officer Bialota asked Jones, "Is this the individual that shot you?" Jones replied, "That's him, he's the one that shot me." Officer Martinez asked Jones if he was a hundred percent sure that Goodloe was the one who shot him, and Jones replied, "Yeah, that's the guy." The officers then arrested Goodloe, with the arrest report indicating that he was taken into custody at 2:03 a.m. Jones died at a hospital approximately an hour later, of the gunshot wound to his leg that had caused massive internal bleeding.

At trial, over Goodloe's objections, the State entered into evidence Jones's statements to the officers identifying Goodloe as the shooter. Additional evidence also implicated Goodloe. Gunshot residue tests performed on his hands within a few hours after the shooting revealed that he either recently fired a gun or was close to a gun when it was fired.[1] A disinterested witness to the shooting also testified, albeit very reluctantly. Michelle Lovett appeared at trial in prison garb, having been taken into custody to assure her appearance at trial. She testified that she was sitting in a car with a man near the shooting when she saw Goodloe (whom she knew from the neighborhood) and another man, both in black hoodies,

---

[1] The expert who testified about the test results conceded that it was also possible that the particles were transferred to Goodloe's hands from some other source.

coming towards the car. She then heard approximately ten gunshots but ducked before she could see who was firing a gun. She called 911 to report the shooting, and subsequently identified Goodloe in a line-up as one of the men she saw immediately before the shooting. She also testified that, at the request of Goodloe's cousin, she later signed an affidavit denying that she had seen Goodloe that night, in exchange for a promise that "they were going to quit threatening" her. She had been threatened prior to signing the affidavit, and an unknown person had fired shots at her, but the threats ceased once she signed the affidavit.

Edward Loggins testified at trial that he had been purchasing cocaine from Jones when the shots were fired. He too observed two men in black hoodies immediately before the shooting but could not see their faces. When the shots were fired, he saw Jones fall to the ground. He fled the scene on foot, running home, only to realize on his arrival that he too had been shot in the leg. Police officers arrived at his home shortly thereafter to question him about the shooting, and he was taken to a hospital for treatment.

The jury convicted Goodloe of first degree murder but declined to make an additional finding that he personally discharged a firearm during the commission of the offense, a finding that could have led to a higher sentence. After the trial and prior to sentencing, Goodloe moved orally for a new trial based on ineffective assistance of counsel. The trial court allowed his trial counsel to withdraw and appointed a public defender to represent him. The court then held a hearing on a counseled motion for a new trial based on ineffective assistance. The court rejected Goodloe's claims after finding that

counsel's decisions relating to the investigation of witnesses and the impeachment of Michelle Lovett were based on a reasonable trial strategy and did not prejudice Goodloe. The trial court then sentenced Goodloe to thirty years' imprisonment. Goodloe subsequently lost on direct appeal and in state post-conviction proceedings before bringing his federal *habeas* petition, which the district court denied.

## II.

We certified only two issues for appeal. First, we found that "reasonable jurists could debate whether a reversible violation of the Confrontation Clause occurred when the trial court admitted police accounts of statements from the wounded gunshot victim who soon died." R. 13. On Goodloe's motion, we later expanded the certificate of appealability to address "whether his trial counsel was ineffective for failing to investigate three witnesses who could have provided an alternative explanation for Goodloe's presence near the scene of the crime." R. 18. We review the district court's denial of Goodloe's *habeas* petition *de novo*. *Jordan v. Hepp*, 831 F.3d 837, 842 (7th Cir. 2016). Because this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we give great deference to the state court. *Jordan*, 831 F.3d at 843. Where the state court has made a decision on the merits, we may grant relief only if that decision was "contrary to, or involved an unreasonable application of clearly established Federal law" as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1); *Jordan*, 831 F.3d at 843.

We begin with Goodloe's Confrontation Clause claim. At this stage of the proceedings, Goodloe does not contend that

the admission of Jones's initial statements—that a person named Damon shot him and that the shooter was wearing a black hoodie—violated the Confrontation Clause. He challenges only the statements that Jones made when Goodloe was brought to the ambulance for identification. In particular, he asserts that the admission of Jones's statements, "That's him, he's the one that shot me," and "Yeah, that's the guy," (collectively the "Show-Up Statements") violated his rights under the Confrontation Clause.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him[.]" The Confrontation Clause bars the admission of testimonial statements against the defendant, unless the declarant is both unavailable at trial, and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Because Jones was unavailable at trial and because Goodloe had no prior opportunity to cross-examine Jones on the Show-up Statements, the determinative issue for the state courts was whether Jones's Show-Up Statements were testimonial in nature:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish

> or prove past events potentially relevant to later
> criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).

The Illinois Appellate Court properly identified the controlling Supreme Court precedent, citing both *Crawford* and *Davis*, and applied those cases to conclude that Jones's statements were not testimonial but were made to enable police assistance to meet an ongoing emergency. The appellate court found that Jones was interrogated in an emergency setting, where the police were responding to a call of "shots fired," and found the victim on the ground with a bullet wound, in obvious pain. The police were concerned that an armed criminal was at large nearby, the court remarked, and the purpose of the police questioning was to meet an ongoing emergency and to protect the public from an armed shooter. Moreover, the scene was not tranquil and safe; Jones's initial statements were made when he was on the ground immediately after being shot, and the Show-up Statements were made when he was in the back of an ambulance at the scene of the shooting, in great pain, and required assistance breathing. His answers to the officers' initial questions, the court found, were given to help resolve an emergency. The court also found that Jones's Show-up Statements confirming that the man the police had apprehended was the "Damon" in question were not formal or testimonial because the emergency was ongoing until the officers knew that they had apprehended the shooter. The shooter might still have been in the vicinity, the court remarked, and the police needed the identification in order to end the emergency. The court rejected Goodloe's claim that the emergency was over because the only suspect was in custody at the scene. The court

noted that the police did not know that they had the right man until Jones confirmed Goodloe's identity. The appellate court also relied on the existence of an unidentified second shooter as supporting the finding of an ongoing emergency. And in fact the record reflected that there was a second shooter, although the officers were not aware of the existence of the second shooter at the moment they returned to the scene with Goodloe.

Goodloe contends that the court unreasonably applied Supreme Court precedent when it concluded that Jones's statements were not testimonial. But the "unreasonable application" standard is a rigorous one:

> Under § 2254(d), a *habeas* court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Court has noted that this standard is difficult to meet and was meant to be so:

> It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that *habeas corpus* is a "guard against extreme malfunctions in the state criminal justice systems," not a

substitute for ordinary error correction through appeal.

*Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

Goodloe has not met the standard for *habeas* relief here. The state court reasonably concluded that statements made to identify the perpetrator in the minutes following a shooting, with a manhunt underway, were made to meet an ongoing emergency. Goodloe's position that the emergency passed as soon as he was handcuffed presumes that the police knew at that time that they had the right man and that the hunt for the shooter was over. But Goodloe only partly matched the description of the shooter. Although his name was Damon, he initially gave the officers another name. He was not armed, and although he was wearing a black hoodie, it was partly hidden under a coat.[2] Given these discrepancies, it was prudent for the police to confirm that they had the right suspect before stopping the search, and reasonable for the Illinois courts to decide that the questions posed and answers given were intended to meet an ongoing emergency in the minutes following the shooting. The Illinois court reasonably found that this was not a formal interrogation conducted to create a

---

[2]  Goodloe contends that because he was unarmed, he posed no further danger. We disagree. A shooter could stash the gun nearby and retrieve it. And in any case, the police officers recovered no gun from Goodloe, and that discrepancy (together with the slightly different clothing and the denial that his name was Damon) created doubt regarding his identity as the shooter, necessitating the show-up to verify that they had the right man.

substitute for live testimony. Indeed, the officers could not have known at that time that they would need a substitute for Jones's live testimony because they did not know that his leg wound would soon lead to his death. Moreover, the appellate court's use of the existence of a second shooter (a fact not known by the officers at the time) in finding that the emergency was ongoing even after Goodloe was in custody is largely irrelevant to the question presented in this appeal: whether the state appellate court unreasonably applied *Crawford* and *Davis* when it concluded that the emergency was ongoing in the minutes after the shooting when the officers did not know whether any armed offender was still in the area.

It might be fair to characterize the question of whether there was an ongoing emergency when the officers brought Goodloe to the ambulance in handcuffs as a close question, and reasonable jurists may even disagree with the state court's answer to that question. But a "state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Because fairminded jurists could disagree on the correctness of the state court's determination, the district court correctly held that *habeas* relief is precluded here.

Goodloe also contends that the state courts unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in finding that his trial counsel was not ineffective. According to Goodloe, counsel was ineffective because he failed to investigate three witnesses who could have provided an innocent explanation

for his presence near the scene of the crime on the night in question. In particular, he asserts that counsel should have interviewed and presented testimony from his friend, Maceo Lee; his girlfriend, Shana Young; and his uncle, Algeron McKinley. According to Lee's 2010 affidavit, Lee would have testified that he was with Goodloe in the early morning hours of December 24, 2002. From midnight to approximately 1:30 a.m., Goodloe, Lee and a man named Trell were drinking in Goodloe's car at 48th Street and Prairie to celebrate Trell's birthday. After Goodloe dropped Trell off at his home, Lee and Goodloe headed south so that Goodloe could meet his girlfriend, Shana, at 2:00 a.m. when she got off work at 114th Street and Calumet Avenue. Goodloe's car began acting up as they drove, so he told Lee that he intended to park the car and walk to meet Shana. Goodloe then dropped Lee off at 113th and Forest Street.

Shana Young provided in her 2010 affidavit that she would have testified that, on December 24, 2002, she was supposed to get off work at 1:00 a.m., go home to her aunt's house at 114th Street and Calumet Avenue by 2:00 a.m., and then meet Goodloe there. She averred that she called Goodloe throughout the previous day to make sure he would be at her aunt's house on time to pick her up. After arriving home, she waited thirty minutes before calling Goodloe's cellphone, only to go into his voicemail. Goodloe then called her back a few minutes later and told her that he was at the police station after being stopped on his way to meet her.

Finally, Goodloe was unable to obtain an affidavit from his uncle, Algeron McKinley, who had apparently moved from the area, so Goodloe filed an affidavit stating what McKinley's

testimony would be if he had been called. According to Goodloe, McKinley would have testified that between 1:45 a.m. and 2:15 a.m. on December 24, 2002, he was at his home at 114th Street and Indiana Avenue cooking for the holidays when Damon came into the house and went into the washroom. McKinley would have testified that when Damon came out of the washroom, he asked McKinley if Shana had called. Damon then left and walked east towards Calumet Avenue to meet Shana.

The State argues that Goodloe procedurally defaulted this claim as it relates to Lee and McKinley by failing to raise it through one complete round of state court review. The State similarly contends that Goodloe procedurally defaulted the claim as to Young by waiving it. The district court rejected the State's claim of procedural default, found both claims preserved, and then rejected them on the merits, finding that the state courts reasonably concluded that Goodloe was not prejudiced by his counsel's failure to investigate or call these three witnesses.

We agree with the district court that the claims were not procedurally defaulted. The State argues that the claims related to Lee and McKinley were defaulted because Goodloe did not raise them through a complete round of state-court review on direct appeal, instead attempting to bring them through a complete round of post-conviction review, where the Illinois Appellate Court held that they were barred by *res judicata*. The State also argues that the claim pertaining to Young was procedurally defaulted because the Illinois Appellate Court found that it had been waived. But in both instances, the Illinois Appellate Court, in post-conviction proceedings, ruled

on the merits of the claim in addition to citing these state procedural obstacles, and the state appellate court decision lacked any plain statement that the court was relying on a state-law ground. As the Supreme Court recently reiterated in *McGirt v. Oklahoma*, when the state court "opinion 'fairly appears to rest primarily on federal law or to be interwoven with federal law' and lacks any 'plain statement' that it was relying on a state-law ground, we have jurisdiction to consider the federal-law question presented to us." 140 S.Ct. 2452, 2479 n.15 (2020) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41, 1044 (1983)). *See also Harris v. Reed*, 489 U.S. 255, 263 (1989) ("a procedural default does not bar consideration of a federal claim on either direct or *habeas* review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted). At no point in the state appellate court opinion in the post-conviction proceedings did the court "clearly and expressly state[]" that it was resting its decision on a state procedural bar. The state appellate court instead addressed the claim of ineffective assistance with regard to these three witnesses both on the merits and on state procedural grounds, without ever indicating that it intended to rest its decision on a state procedural bar, and we may therefore treat the claim as preserved for *habeas* review on the merits.

On the merits, the state appellate court rejected Goodloe's claims of ineffective assistance as related to Lee and McKinley because neither man's affidavit provided an alibi for Goodloe and in fact their testimony might have been damaging to

Goodloe's theory of the case.[3] Because Goodloe could not point to any favorable testimony from either Lee or McKinley, the appellate court concluded that counsel was not ineffective for failing to investigate or call them, essentially finding that Goodloe was not prejudiced by his counsel's failure. As for Young, the court similarly concluded that because she was not in the area with Goodloe at the time of the shooting, she could not have provided an alibi, could not have contributed to Goodloe's theory of the case, and could not have provided any exculpatory testimony. The court concluded that counsel was therefore not ineffective for failing to call her, again essentially finding that Goodloe was not prejudiced by the failure to investigate or call this witness. Goodloe complains that the state court's conclusion was unreasonable because the evidence against him was slim, and these witnesses could have provided an innocent explanation for his presence near the shooting. He asserts that their testimony would also have buttressed Loggins's "unequivocal testimony that he did not see Goodloe at the scene and did not believe Goodloe was one of the shooters."[4] He also points out that the jury declined to find that

---

[3] Counsel testified in part that the police report contained information about Lee's membership in a gang, and he did not want Lee possibly testifying about being in the same gang as Goodloe.

[4] Loggins's testimony was far less favorable than Goodloe portrays. Goodloe ignores Loggins's admission that he could not see the faces of the two men in black hoodies. Although he also testified that he knew Goodloe and did not see him that night, because he could not see the faces of the two men in black hoodies, his testimony does little to support Goodloe's claim that Loggins would verify that he was not present at the

(continued...)

he personally fired a gun. Finally, he complains that the state court wrongly limited the value of these witnesses to whether they could provide an alibi for him.

A fair reading of the Illinois appellate court's opinion demonstrates that the court did not limit the value of these three potential witnesses to alibi testimony, as Goodloe claims. But even if we were to find that trial counsel's performance was deficient, an assessment we need not make in this case, we cannot conclude that the state court unreasonably applied *Strickland* when it determined that Goodloe was not prejudiced by the failure to call these witnesses. *Strickland*, 466 U.S. at 692 (any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution). The evidence against Goodloe was actually quite strong. The victim named him, described an article of clothing he was wearing when he was apprehended, and confirmed his identity to police officers, all within a matter of minutes after the shooting. Not only was Goodloe found a few blocks from the scene shortly after the shooting, he gave a false name at first and forensic tests demonstrated that he had either recently fired a gun or had been near a gun when it was fired. Finally, a disinterested witness, a woman who knew him from the neighborhood, testified to his presence at the scene at the

---

[4] (...continued)

shooting. Moreover, Loggins did not testify, as Goodloe claims, that he "did not believe that Goodloe was one of the shooters." Instead, when asked how he replied to police questions regarding whether Goodloe was involved in the shooting, he testified that he told the police officers, "Not that I know of, no."

time of the shooting. She also testified that she had signed an affidavit denying that Goodloe was at the scene only after she had been threatened and shot at. So reluctant was she to testify that she had been taken into custody to assure her appearance at trial.

Weighed against this relatively strong evidence, the testimony of these witnesses that Goodloe had an innocent reason for being near the scene of the shooting was unlikely to create a reasonable probability that the result of the proceeding would have been different had the jury considered their accounts.[5] *Strickland*, 466 U.S. at 694. Under *Strickland*:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. The state appellate court reasonably applied *Strickland* when it found that counsel's failure to present the testimony of these three witnesses did not meet this standard. *Harrington*, 562 U.S. at 104 (it is not enough to show that the errors had some conceivable effect on the outcome of the proceeding; counsel's errors must be so serious as to

---

[5] In addition to the fact that none of these witnesses were with Goodloe at the time of the shooting, we note that the record already contained an innocent reason for Goodloe to be present at 114th Street and Prairie Avenue. The identification that he provided to Officer Bialota showed a home address at 11514 South Indiana, just a few blocks away. He was not out of place in the neighborhood.

deprive the defendant of a fair trial, a trial whose result is reliable). The district court therefore correctly denied Goodloe's petition for a writ of *habeas corpus*.

AFFIRMED.