In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2638

MICHAEL GILBREATH,

*Petitioner-Appellee,*

*v.*

DAN WINKLESKI, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:19-cv-00728-jdp — **James D. Peterson**, *Chief Judge.*

ARGUED APRIL 15, 2021 — DECIDED DECEMBER 30, 2021

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.* Michael Gilbreath was convicted by a Wisconsin jury of first degree sexual assault of a child for repeatedly molesting his step-granddaughter, S.L., beginning in approximately 2002 or 2003 when she was nine years old, and ending in 2006 when she was twelve. The district court

granted his petition for a writ of *habeas corpus* on the basis of ineffective assistance of counsel. We reverse.

## I.

We presume that the factual findings of the state court are correct for the purposes of *habeas* review unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Gilbreath has not provided clear and convincing evidence rebutting the state court findings and so we defer to the state court's version of events. *Goodloe v. Brannon*, 4 F.4th 445, 447 (7th Cir. 2021); *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018). We will supplement the state court's recitation of the facts with undisputed facts that provide background.

## A.

From infancy, S.L. was raised by her grandmother, Patricia Gilbreath, and Patricia's husband, Michael Gilbreath, the petitioner here.[1] In addition to S.L., Gilbreath and Patricia had two children of their own, Haiden, who is the same age as S.L.; and Aaron, who is four years older than S.L. They also raised S.L.'s half-brother, Giovanni, who is two years younger than S.L., from the age of five. Although Gilbreath and Patricia were her grandparents, S.L. referred to them as her parents. This family of six lived in a small house that had two bedrooms at the time that the assaults began. When S.L. was nine, she shared a bedroom with all of the children in the home. She and Haiden slept together on a futon, where they arranged them-

---

[1] For clarity, we will refer to the petitioner as Gilbreath and will refer to other family members by their first names.

selves so that S.L.'s head was even with Haiden's feet. Giovanni and Aaron slept in a bunk bed directly above the girls for a year or two of the relevant time period, but later moved to the second bedroom after a third bedroom was created by a garage conversion. Patricia slept on a couch in the living room, and had a direct view into the girls' bedroom, which was just steps away.

During the relevant time period, Gilbreath would regularly come home drunk in the early morning hours and sometimes go into the children's room. Gilbreath's nighttime visits ended in 2006 when he was convicted of driving under the influence and was sentenced to a term of imprisonment. In 2008, shortly before Gilbreath was due to be released from prison, S.L., then fourteen years old and in eighth grade, disclosed for the first time that Gilbreath had sexually assaulted her during these nighttime visits. S.L. first told a friend and then told a school guidance counselor at that friend's urging. That first disclosure led to an investigation by social services and law enforcement.

Social worker Kelly Oleson interviewed S.L., accompanied by Deputy Cheryl Thompson. Oleson and Thompson both generated reports of the interview.[2] Oleson wrote that S.L. told her that Gilbreath would come into her room at 2:00 or 3:00 a.m. after a night of drinking, that he would get into the bed and rub her stomach, and touch and rub her breast and vaginal

---

[2] When we describe the reports of social services and law enforcement as undisputed, we mean only that there is no dispute as to what the reports say. We do not mean to imply that Gilbreath does not dispute the truth of some of the statements that social services and law enforcement recorded in those reports.

areas (which she indicated by gesturing). S.L. reported that this had happened five or six times, and that the touching occurred over her clothing. She also said that Gilbreath "used to do it when she was younger." S.L. said that Haiden was generally asleep while this was happening but that Haiden had told her that this had happened to her once too. Gilbreath would also sometimes kiss both girls on the lips. S.L. would often pretend to be asleep when these things were happening. At the end of each incident, Gilbreath would leave the room and go to his own bedroom. S.L. blushed and became embarrassed when she told Oleson that she had not told Gilbreath to stop. She told Oleson that Gilbreath once apologized for what he had done to her the previous night, and that he was a different person when he was drinking. She said that she had not told Patricia about what had happened, that she feared her parents would get divorced if Patricia found out, and that she did not want Gilbreath to go to jail or have to participate in programs because this had happened. S.L. did not think Gilbreath would do this again unless he began drinking again. When asked if anyone else knew what had happened, S.L. reported that she once told Aaron and that he had replied that she should tell him if it happened again and he would do something about it. She had also told the friend who encouraged her to go to the guidance counselor, Aaron's best friend Dustin, and her cousin Kayla. Deputy Thompson's report largely tracked that of Oleson in all of the relevant details, including a note that S.L. didn't want "anything big" to happen to Gilbreath such as additional jail time, that she just wanted him to not do this again. After concluding the interview with S.L., Oleson interviewed Haiden. According to Oleson's report of that

interview, Haiden reported that Gilbreath had kissed her "like a boyfriend." As a result of the 2008 investigation, Patricia was asked to put a lock on the door of the girls' bedroom and to keep Gilbreath away from S.L.

In 2010, S.L., then sixteen years of age, again raised allegations of the pre-2008 abuse with a school counselor, and she was again interviewed by social services and law enforcement. Oleson conducted the social services interview for this second disclosure, accompanied this time by Investigator Mark Bitsky of the county sheriff's office. According to Oleson's report, S.L. said she was getting into trouble with her parents, and that Gilbreath was calling her abusive and degrading names and threatening to hit her. He compared her unfavorably to her biological mother (Patricia's daughter) and threatened to punch her in the face. She had a boyfriend named Robert whom Gilbreath did not like. Although Gilbreath would not allow her to date, she was sometimes allowed to visit Robert at his home. S.L. told Oleson that she often hid out in her bedroom because of Gilbreath's poor treatment of her. S.L. reported that Gilbreath used very vulgar and inappropriate language with her and sometimes with Haiden regarding his sex life and his past sexual encounters; he also told S.L. that he no longer had sex with Patricia. Oleson's report described Gilbreath's remarks to S.L. as "graphic and inappropriate for a parent to be having with their child." R. 7-4, at 2. S.L. was concerned that Gilbreath might have started drinking again. She was also concerned because he had begun to come into her bedroom again at night, and she feared he would act as he had before going to prison in 2006. Oleson noted that S.L. had engaged in self-harm by

cutting her skin and also by burning her skin with chemicals. S.L. reported that Gilbreath was angry about the cutting behavior. Her boyfriend, Robert, also engaged in cutting, and her parents blamed Robert for S.L.'s self-harm.

S.L.'s second disclosure, like her first, addressed conduct that occurred when she was between nine and twelve years of age. She denied that Gilbreath committed any new offenses after his 2008 release from prison. But during the second disclosure, Oleson reported that S.L. described more frequent instances of abuse in the original time period of 2002 or 2003 to 2006. For example, she described certain abuse as occurring more times than she could count, and then estimated that it occurred twenty times. S.L. also gave graphic accounts of particular incidents, telling Oleson that Gilbreath had regularly touched her genital area beneath her clothing (hereafter "the nighttime abuse"), including a specific incident that occurred in his bedroom; that he had caused her to touch his genitals directly (hereafter "the masturbation incident"); and that he had engaged in other abuse that occurred while he was bathing her at a young age (hereafter "the bathtub incident"). These allegations were more detailed than those that she had made two years earlier, at the age of fourteen. Oleson characterized the second disclosure as "more descriptive" than the interview in 2008, but noted that "many [sic] of the surrounding detailed information was identical." R. 7-4, at 4. S.L. told Oleson and Bitsky that she did not want them to talk to Gilbreath or Patricia because she feared her mother would be angry with her. She reported that the entire family was angry with her after her 2008 disclosure. Oleson also interviewed Haiden again who this time told Oleson that she was "the lucky one."

Oleson halted Haiden's interview when she became very upset.

Bitsky requested that Oleson arrange a forensic interview at Safe Harbor, a child advocacy center in Madison, Wisconsin. The Safe Harbor interview, which was recorded and transcribed, largely tracked the second interview with Oleson, but in greater detail. Because the second interview with Oleson was largely consistent with the forensic interview, we will refer to these jointly as the second disclosure. According to Bitsky's report of the forensic interview, S.L. described certain recurring nighttime abuse as taking place two to three times a week, but she had difficulty "singling out each event." R. 7-7, at 2. In describing the regular incidents of nighttime abuse, S.L. reported that Gilbreath would remove her bottom clothing and directly touch her genitals. She also described three particular incidents that differed from the usual nighttime abuse. In addition to an incident of nighttime abuse that occurred in Gilbreath's bedroom rather than her own, she described two incidents of particular conduct that were different from the regularly occurring abuse. The first incident, the bathtub incident, involved Gilbreath getting into the bathtub with her while they were both naked, and having him place her, in a seated position, on top of his penis. She did not recall anything more specific from that incident. She believed this was the beginning of the abuse, and said that she was very young when it happened, too young to bathe herself. She also described the masturbation incident in detail, but could not recall how the masturbation incident ended. She believed it was the last incident of abuse prior to Gilbreath's arrest for drunk driving in 2006. S.L. repeated to the forensic interviewer

that Gilbreath called her vulgar names, that he had not abused her since being released from prison, that Gilbreath had inappropriate and graphic conversations with her about his sex life, that she believed he had abused Haiden on one occasion, and that Gilbreath had twice apologized to her for the abuse, once before he went to prison and once after he came home from prison.

The record does not reveal why S.L.'s first disclosure did not lead to criminal charges against Gilbreath, but the second disclosure resulted in Gilbreath being charged with first degree sexual assault of a child. After S.L. made the second disclosure to Oleson and Bitsky and before the forensic interview, Gilbreath was arrested[3] and Patricia placed S.L. in foster care.

**B.**

With this background in place, we turn to the evidence produced at trial. The State's primary witness at Gilbreath's three-day jury trial was S.L., who was then twenty years old, married and the mother of a child. The State also presented testimony from Ann McKinley (an expert on child sexual abuse), Patricia and Haiden. Gilbreath testified on his own behalf and was the only witness presented in the defense case.

At trial, S.L. testified that, when she was a child, Gilbreath came into her room drunk late at night and touched her breast and genital areas under and over her clothing. Consistent with her second disclosure, she said that it happened many times

---

[3] It appears that Gilbreath was taken into custody on a probation violation involving the use of alcohol. He was later charged with abuse of S.L., but faced consequences for the probation violation in the interim.

but could not give a definitive number. She also testified regarding three specific incidents, namely, the instance of nighttime abuse that occurred in Gilbreath's room, the masturbation incident and the bathtub incident consistent with the second disclosure. She said that, during the time period when the abuse was occurring, she told her cousin Kayla, and Aaron what was happening. In the case of Kayla, she tried to spell the word "molest" on a piece of paper, and Kayla replied that it was "gross," that she would not go near Gilbreath again. She testified that when she told Aaron that Gilbreath was touching her inappropriately, he replied that if it happened again, she should tell him and he would do something about it. She also described telling the friend who encouraged her to report it, and the guidance counselor whom she told as a result. She testified that she did not go into detail about the abuse during the first disclosure because she was uncomfortable and did not understand some of terms. She described Gilbreath's verbal abuse after he returned from prison, and testified that when she was 15 or 16, Gilbreath cut up her temporary driver's license. She denied delinquent behavior or being suspended at school. She admitted that she cut and burned herself during that time period, explaining that she did so in part to make herself unattractive to Gilbreath.

Asked what caused her to disclose the abuse for a second time in 2010, she replied that she "was scared [of] what was going to happen," that "everything started kind of going south where, you know, my license got tore up, and I was getting yelled at all of the time." R. 6-10, at 137. She implied that she was getting bad grades at that time and said that she was getting yelled at for things she had not done. After the second

disclosure, Patricia was angry with her and accused her of lying, and Haiden would not speak to her. Shortly after the second disclosure, social services removed her from the home and she was placed in foster care. Asked if she had ever made a written account of what happened to her, S.L. testified that she wrote a letter to her counselor, who thought that the writing exercise might help her cope with what had happened.

On cross-examination, defense counsel established that S.L. saw Gilbreath as the disciplinarian in the home, that he was the one to ground the children or take away privileges. S.L. also agreed that Gilbreath had "more to say" about the girls' relationships with boys. Counsel then turned his attention to the letter that S.L. said she had written to her counselor. In response to defense counsel's questions, S.L. confirmed that she wrote the letter on her own in response to her counselor telling her to write down everything she remembered; that she typed it on a computer, chose the font and formatting, and printed it out; and that she wrote it when she was still in high school. Defense counsel then asked:

> And when you were doing that, were you trying to write out as best you could what you remembered happening so that you could address that with your counselor, correct?

R. 6-10, at 156. S.L. replied, "Correct." In response to questioning, she indicated that she wrote the letter in approximately an hour. Her foster mother later provided it to the prosecution.

After going through the layout of the small house and having S.L. identify various locations, defense counsel then

brought forth a number of letters and asked S.L. if she had written the letters to Gilbreath while he was in prison. After saying that she did not recognize any of the letters, she eventually conceded that, although she did not remember writing any of the letters, she may have forgotten and so could not say for certain that she did not write a particular letter.[4] Counsel then attempted to impeach S.L. with Oleson's initial report from the first disclosure. Counsel pointed out that S.L. reported to Oleson that the touching occurred over her clothing and that it had happened five or six times. S.L. testified that she did not remember being asked about the number of times the incidents occurred, and also did not remember being asked for details at that first interview. Nor did she recall saying that the incidents occurred five or six times, or that the touching occurred only over her clothing. Counsel then attempted to further impeach her with a statement she had made under oath at a preliminary hearing two years before the trial. At the preliminary hearing, she was also asked about whether she had told Oleson at the initial disclosure that Gilbreath touched her only over her clothing. At the preliminary hearing, S.L. denied telling Oleson that the touching occurred only over her clothing. At the trial, she confirmed that this would still be her answer, despite what

---

[4] Defense counsel attempted to establish that S.L. sent Gilbreath letters when he was in prison where she expressed a strong desire to have him home again. He argued that the letters demonstrated that S.L. did not fear Gilbreath's return from prison, as she claimed. The prosecution sought to show that the letters were forgeries. Although there is no way to know what the jury made of the letters, the trial court determined during sentencing proceedings that the letters were forged. R. 6-16, at 31.

was written in Oleson's report. In response to the direct question, "So if [the interviewers] wrote that, they were mistaken?", S.L. replied, "Yes." R. 6-11, at 186–87.[5]

Counsel then returned to the letter S.L. wrote to her counselor, and on this subject, he had even more success, so much so that he was later stunned by the jury's verdict. We will describe this impeachment in detail because it was critical to counsel's decisions at trial. S.L. first confirmed that she had not seen the letter for years. Counsel then pointed out that the letter said that Gilbreath would barge into her room between midnight and three in the morning with no clothes on (contrary to her trial testimony that he would enter the room wearing a robe and underwear). S.L. did not remember writing that he came in naked, she denied that it had ever happened that way, and she confirmed that she recalled him wearing a robe.

Counsel than brought up a number of statements in the letter to the counselor that S.L. confirmed were not true and denied writing in the letter that she had just admitted writing.

---

[5] Defense counsel's attempt to impeach S.L. was somewhat confusing until he handed her a transcript of her prior testimony. Until that point, neither S.L. nor the presiding judge understood what he was asking. The confusion cleared once the transcript was provided. S.L. then gave the answer that defense counsel sought, namely that she disagreed with Oleson's report. She denied that she had said at the initial disclosure interview that the touching incidents all occurred over her clothing. She said that Oleson was mistaken if that was what she wrote. That meant that, although her trial testimony was consistent with her testimony at the preliminary hearing, it conflicted with the contemporaneous report generated by Oleson, a disinterested third party who interviewed her close in time to the incidents.

For example, the letter stated that, during the masturbation incident, Gilbreath ejaculated on her bed. She did not remember writing that to the counselor, and confirmed that she did not recall how the masturbation incident ended. She also did not remember writing more details regarding the bathtub incident, and agreed that the bathtub incident did not happen the way it was described in the letter to her counselor. She confirmed that she remembered nothing about the bathtub incident other than Gilbreath sitting her on his lap in the tub when they were both naked. She also denied writing that she said nothing to Gilbreath while this was happening because he would beat her, testifying that she had not written this and that it was untrue. She denied writing that the abuse went on every night for four to five years, and also denied that the abuse went on for that long, explaining that Gilbreath was in prison for some part of that time period. She insisted that she would not have put something in the letter that was not true. Asked how all of this incorrect content got into the letter, she said she did not know, that she gave the letter to her foster mother and did not know what happened to it after that. She also said that her foster mother would not have altered the letter.

She denied writing that, after her secret was out (after the first disclosure), she became a "wild child" for two years, doing what she wanted and that no one could tell her what to do. She denied writing that she was cutting and burning herself, but agreed that it was true that she was cutting and burning herself in that time period. She denied writing other, less material statements in the letter, some of which she agreed were true and some of which she testified were not true. Defense counsel asked if she lied to her counselor in these

statements, and she replied, "I did not lie to my counselor." R. 6-11, at 202. She also denied typing most of the letter that she had just testified that she typed, saying, "No. Most of the stuff in here, I did not type, because it's not true." R. 6-11, at 202. There is no dispute that the letter to the counselor contained all of the statements that S.L. first affirmed that she wrote and then moments later denied that she wrote. And there is no dispute that this version of events was a significant departure from the versions she reported at the first and second disclosures.

Counsel concluded his cross-examination of S.L. with questions about whether she reported at the second disclosure having "tension and disputes" with Gilbreath. S.L. did not recall saying those things to the interviewers at the second disclosure. Nor did she recall telling the interviewers that Gilbreath and Patricia did not like her boyfriend Robert and tried to cut her off from him. She also did not remember saying at the second disclosure that Gilbreath was yelling at her almost every day. She did remember Gilbreath tearing up her driving permit, and admitted she was angry because she had paid for driver's education and the permit by herself with money she earned from work, and because it delayed her ability to drive. She agreed that she was "pretty unhappy, angry even," when Gilbreath did this. She could not recall when this occurred in relation to the second disclosure.

The prosecutor attempted to rehabilitate S.L. on re-direct, trying to recast the letter to the counselor as representing emotional truth rather than factual truth. S.L. eventually agreed that the letter was meant to express emotional truth. She explained that she had significant mental health issues

after she was removed from the Gilbreath home following the second disclosure, suffering from depression to the point of suicidal thoughts. It was during that time frame that she was in counseling and would have written this letter, and agreed that her memory of writing parts of the letter could have been impaired by the emotional distress she was suffering at that time. On re-direct, S.L. also explained that in her first disclosure interview, it was difficult to tell Oleson and Thompson that the abuse occurred both under and over her clothing. She confirmed that the interviewers showed her a diagram of an unclothed human body in order for her to identify where she had been touched. By pointing to areas of the unclothed body in the diagram, she believed she had conveyed in the first disclosure that she was touched under and over her clothing. On re-cross, she continued to deny having written anything that was factually untrue, and could not explain the erroneous contents of the letter to her counselor.

The prosecution next presented Haiden and Patricia. Haiden did not recall telling Oleson that Gilbreath kissed her like a boyfriend but agreed that, because the interview occurred a long time ago, it was "maybe" possible that she said it. Haiden testified that Gilbreath called S.L. a "bitch," and said he also called the other children names when he was angry. Haiden confirmed that Gilbreath sometimes came into the girls' bedroom at night. Although she was usually sleeping when he came in, she recalled that he would say goodnight and hug them. She would not fall asleep again until he left. She denied telling Oleson in 2010 that she did not know what happened when Gilbreath would come into the room at night

because she would roll over. Shown Oleson's report of her 2010 interview, Haiden said that her memory was not refreshed. She did recall crying at the interview, agreeing that the interview was difficult for her and that it ended because she was upset. She did not recall telling Oleson that she was "the lucky one." R. 6-12, at 257. She conceded that it was possible that she told Oleson that she was the lucky one because she was "really confused then." R. 6-12, at 258. Haiden also confirmed that Gilbreath had inappropriate conversations with his children about his sex life, including discussions about receiving oral sex. She recalled being fifteen or sixteen during the conversation about oral sex.

On cross-examination, Haiden recalled Gilbreath visiting the room but not getting between the girls on the futon bed; instead he "either sat on our bed or laid on our bed somewhere." R. 6-12, at 265. Haiden also testified that Gilbreath talked about his sexual escapades in front of S.L., Giovanni and herself, and that they would laugh when he said these things.

Patricia testified that she found out about S.L.'s second disclosure only after calling Bitsky to find out why Gilbreath had been arrested. Patricia met the next day with Oleson and asked her to remove S.L. from the home because she did not want her around and was "done with her." R. 6-12, at 293. As for S.L.'s boyfriend Robert, Patricia testified that S.L. was allowed to visit him at his home when his parents were present but was not allowed to stay overnight. Patricia denied that S.L. was a "problem child," but said that, beginning at the ages of fourteen or fifteen, she did not want to be told what to do anymore, that she "wanted to come and go," and wanted to

date. R. 6-12, at 300. But they did not allow her to stay out late and required her to let them know where she was. Patricia confirmed that S.L. was never suspended or expelled from school; nor was she ever in juvenile court. Asked if it was her belief that S.L. disclosed the sexual assault because there were restrictions and she did not want to follow the rules, Patricia replied, "Well, her license was cut up and stuff like that. She wanted to go and do what she wanted to do, and she couldn't do that." R. 6-12, at 302. The prosecutor then asked what the problem was when S.L. was fourteen that Patricia believed caused her to retaliate by alleging sexual assault (at the time of the first disclosure), and Patricia responded, "I don't know." R. 6-12, at 302.

Patricia conceded that Gilbreath was harder to deal with when he was drunk and became "cocky." R. 6-12, at 306. At those times, she would not talk to him. She testified that he went out drinking once or twice a week. She confirmed that, when he came home drunk, he would sometimes go into the girls' rooms, where she could see him from the couch where she slept. He sometimes lingered there long enough for her to ask him what he was doing. She said that he sat on the floor in the girls' room, and that although she was a light sleeper, it was possible that she fell back asleep on occasion when he was in the girls' room.

Rather than calling Oleson as a witness, the parties agreed to two stipulations regarding Oleson's reports. The prosecution read the following stipulation to the jury:

> If called to testify, Social Worker Kelly Oleson would testify that, at one point in the interview of

> Haiden Gilbreath on June 2, 2010, Haiden stated, quote, "I was the lucky one."

R. 6-13, at 6. Defense counsel told the jury:

> [T]he defense notes that it's the agreement of the parties that were Kelly Oleson called to testify, that—about the interview of [S.L.], January 26 of 2008, that [S.L.] was asked how many times the touching had occurred. And she stated, "Five or six times."

R. 6-13, at 6. That concluded the prosecution's case-in-chief.

Gilbreath then testified in his own defense. He conceded that he had eight convictions for driving under the influence, and asserted that May 11, 2006, the day of his last arrest for drunk driving, marked the last time he consumed alcohol. He also admitted that on certain occasions prior to that May 2006 arrest, when he was on probation after serving time in jail for driving under the influence, he violated the conditions of his probation by continuing to drink alcohol.[6] He testified that during his last period of custody (from 2006 to 2008), he decided to stop drinking and entered an alcohol treatment program at an inpatient facility.

Shortly before his release from prison in 2008, he learned from his wife that S.L. had accused him of sexual abuse. He

---

[6] On cross-examination, he admitted that he drank in violation of his probation conditions when on release after a drunk driving offense in 2004. He testified that although he was going to bars once or twice a week during that time, he was not caught, and he agreed that Patricia, Haiden and S.L. covered for him during that time. R. 6-13, at 114–16.

testified, "I swallowed my heart," when he heard this, and could not believe that S.L. "would lie about me sexually assaulting her." R. 6-13, at 71. He admitted that he came home drunk late at night four or five times a month,[7] and that he infrequently[8] went into the girls' room in that condition. He testified that he also went into his sons' room when he came home drunk, because he missed his children. He explained that when he went into the children's rooms, he would smoke a cigarette, drink a glass of water, say goodnight, tell the children he loved them, and say prayers with them. He testified that he stayed in the rooms for five minutes or less. Counsel led Gilbreath through the small layout of the house, the sleeping arrangements, the lighting at night, and the improbability that a grown man could get into a small futon with two children without Patricia or Haiden noticing that he was there. Gilbreath denied climbing on the futon with the girls during nighttime visits.[9]

He described himself as the principal disciplinarian of the family, imposing punishments that included grounding,

---

[7] On cross-examination, he said he went to bars once or twice a week, sometimes more and sometimes less. R. 6-13, at 108.

[8] On cross-examination, he called his visits to the girls' room "rare," claiming that although it was important to him to say good night to his children and although he came home drunk once or twice a week, he went into the girls' room at night only a "couple times" throughout their entire childhood. R. 6-13, at 109–10.

[9] He conceded on cross-examination that he did lay on the futon with his children during the day, but claimed he was never on the futon with both S.L. and Haiden at the same time. R. 6-14, at 134–35.

chores, spanking, and writing out the alphabet. Asked if the girls had behavioral problems that required discipline before he went to prison in 2006, Gilbreath replied, "Not so much the girls." R. 6-13, at 90. Asked about behavioral problems among the children after he was released from prison in 2008, Gilbreath testified that S.L. was constantly lying, going places other than where she said, not coming home on time, and not calling. He imposed discipline but she continued to break his rules. At one point, as a result of her lying, he decided to cut her driver's permit in half because he did not trust her driving on his insurance. S.L. cried when he cut the permit in half. He also was "a little bit" concerned about her relationship with Robert, and had placed restrictions on the times and places that she could be with him. R. 6-13, at 102. S.L. argued with him over the restrictions. Asked about his relationship with S.L. during that time, Gilbreath responded, "In that time frame, me and [S.L.] were fine. Me and [S.L.] got along just fine." R. 6-13, at 103. In clarifying the time frame, Gilbreath explained that he and S.L. were "fine until I cut her license in half. And then she began to somewhat isolate. We got along." R. 6-13, at 103. As for the timing of cutting up the permit, Gilbreath believed it

was a week or two before he was taken into custody in 2010.[10] R. 6-13, at 104.

Gilbreath testified that he was interviewed by law enforcement after each of S.L.'s disclosures. When he was released from prison in 2008, he voluntarily spoke to detectives about S.L.'s allegations. He told them that it did not happen and he did not know why she would make such accusations. Two years later, he was taken into custody for two months on a report that he had been drinking and driving in violation of his probation conditions. He denied that he had been drinking, and admitted only that, although he was not permitted by the conditions of his probation to go to bars, he had done so in order to pick up his children from work.[11] During this two-

---

[10] There was some confusion in the record on the timing of the driver's permit incident. On cross-examination, Gilbreath agreed that he cut up S.L.'s permit in the spring of 2008, approximately two years before the second disclosure. R. 6-14, at 129. In closing arguments, the prosecutor corrected what she characterized as a math error in her claim that two years transpired between the permit incident and the second disclosure; she asserted instead that one year and one month passed between the permit incident and the second disclosure. R. 6-14, at 164. The jury was admonished that the attorneys' statements were not evidence. R. 6-14, at 148.

[11] Cutting an exceedingly fine distinction, Gilbreath testified that he was prohibited from entering bars or taverns, which he understood to mean businesses that earned income mainly through selling alcohol. His children worked at a resort which he thought he was allowed to enter. He admitted to "hang[ing] out" at the resort "[a] little bit," but denied drinking while he was there. R. 6-13, at 97. Nevertheless, when released after the two-month incarceration, he was required to report in to probation by phone at certain

(continued...)

month incarceration, Bitsky interviewed him regarding S.L.'s second disclosure. He told Bitsky that he was innocent, and that he had nothing to say about something that did not happen. The defense rested at the close of Gilbreath's cross-examination.

## C.

The jury made short work of the case, retiring to the jury room at 4:35 p.m. on a Friday afternoon, and returning with the verdict of guilty at 6:05 p.m. The court sentenced Gilbreath to ten years in prison, to be followed by fifteen years of extended supervision. In a post-conviction motion, Gilbreath sought a new trial on two grounds: in the interest of justice because the real controversy of S.L.'s credibility was not fully tried; and due to ineffective assistance of counsel.[12] There was considerable factual overlap between the two issues raised. The same judge who presided over the trial held a hearing on Gilbreath's motion at which defense counsel testified extensively regarding his representation of Gilbreath at trial. We will discuss counsel's testimony below. The court also heard testimony from Aaron, Haiden, Giovanni, Kayla, Kayla's mother Dawn (who is Gilbreath's sister), Gilbreath and Patricia. The court denied the motion for a new trial, rejecting

---

[11] (...continued)
times and submit to Breathalyzer tests. A jury could infer from this that probation suspected that he was in fact drinking again.

[12] Gilbreath raised additional issues on the post-conviction motion that are not relevant to the issues on appeal. The court denied relief on those claims as well.

both grounds. In rejecting the statutory claim that the real controversy of S.L.'s credibility was not fully tried, the court noted that the defendant bore the burden of demonstrating a substantial probability that a new trial would produce a different result. *See* Wis. Stat. § 752.35. The court found that the jury did in fact hear evidence on every one of the topics raised by Gilbreath. The court dismissed the need for "new witnesses or more witnesses saying the same thing," characterizing the proposed evidence as "just old wine and new bottles." R. 6-16, at 18. The court characterized the omitted evidence as repetitive and cumulative, and concluded that Gilbreath did not demonstrate a substantial probability that a new trial would produce a different result.

The court also rejected the motion for a new trial based on ineffective assistance of counsel. Gilbreath asserted that counsel was ineffective because: (1) he did not object on hearsay and confrontation grounds when S.L. testified that she reported the assaults to family members and they responded with supportive statements; (2) he failed to impeach S.L. with prior inconsistent statements regarding the nature of the assaults and her motive to lie; (3) he did not present family witnesses who could have contradicted S.L.'s testimony and corroborated a motive to lie; (4) he did not present numerous witnesses regarding S.L.'s character for truthfulness; (5) he failed to present evidence on the authenticity of letters purportedly written by S.L. to Gilbreath when he was in prison;[13] and (6) he failed to investigate the existence of an

---

[13] This issue was raised in relation to a request to vacate the sentence and
(continued...)

audio recording of S.L.'s 2010 second disclosure interview with Oleson and Bitsky.

In assessing defense counsel's testimony regarding his strategy and trial decisions, the court remarked that the transcript "should be required reading in every law school trial practice class." R. 6-16, at 25. Although some of counsel's tactics did not work out the way he thought they would, his decisions were rational and based on the law and the facts, the court found, noting that counsel had "sound reason[s]" for the trial strategy decisions that he made. *Id*. In particular, he used third party witnesses to impeach S.L.'s testimony and also impeached her with prior inconsistent statements. He presented evidence regarding the crowded physical layout of the house and the close proximity of witnesses who saw and heard nothing amiss. He made clear that once he impeached S.L. regarding the letter to her counselor, he made a conscious decision that more impeachment, more evidence regarding her mental health, and more testimony about her character for untruthfulness was not only unnecessary but would have blunted the effect of what he accomplished in that cross-examination. Counsel testified that his cross-examination of S.L. was better than he could have ever hoped it would be, and

---

[13]  (...continued)

re-sentence Gilbreath because the court purportedly relied on incorrect information when it concluded that the prison letters from S.L. were forged. The court rejected the claim that additional witnesses on the origin of the letters would have changed his conclusion that the letters were forged. During the post-conviction hearing, the court reiterated its finding that the letters purportedly written by S.L. to Gilbreath while he was in prison were forged. R. 6-16, at 31–34.

the court agreed with that assessment. Indeed, the judge remarked, "I thought [S.L.] had been cut to pieces." R. 6-16, at 26. According to the judge (recall, this was the same judge who presided over the trial), counsel "got [S.L.] to, in my view—obviously not in the jury's view—but in my view, kind of self-destruct." R. 6-16, at 27. The cross-examination on the letter to the counselor was effective enough to cause the court to characterize the case as "enough … to go to the jury, but it certainly wasn't a real strong case." R. 6-16, at 26. With regard to the witnesses called and the testimony given at trial, the court could not conclude that counsel's performance fell outside the wide range of competent professional services taken as a whole.[14] The court's only area for concern was counsel's failure to realize that Oleson's 2010 report indicated that Bitsky had recorded the interview. Because he did not notice that note in Oleson's report, he did not seek the recording for possible use at trial. The court had already concluded in analyzing the "real controversy" motion that, despite that notation, such a recording did not exist at the time of trial and did not exist at the time of the post-conviction hearing, so counsel's error had no effect on the outcome. R. 6-16, at 14, 29. In the end, the court concluded that counsel's performance was not deficient and that Gilbreath had not been prejudiced by any of counsel's claimed errors or omissions.

---

[14] In considering Gilbreath's claim that defense counsel should have presented additional witnesses, the court found as a factual matter that Aaron was unavailable to testify at Gilbreath's trial because he was on probation in Colorado and was prohibited from leaving the state at that time. R. 6-16, at 15. Gilbreath makes no effort in this appeal to demonstrate that the court's factual finding was erroneous in any way.

The Wisconsin Court of Appeals affirmed the trial court's ruling. The court noted that, at the post-conviction hearing, various members of the Gilbreath family testified that they believed that S.L. had a character for untruthfulness, and that none of them had ever witnessed the alleged assaults despite being in close proximity in the small house. In rejecting the statutory claim that the real controversy of S.L.'s credibility had not been fully tried without this additional evidence, the court cited *State v. McAlister*, 911 N.W.2d 77 (Wis. 2018), and concluded that the evidence Gilbreath sought to introduce was simply new impeachment material of the same general character as impeachment evidence produced at trial, and was therefore cumulative. That evidence included testimony from Aaron and Kayla denying that S.L. ever disclosed the assaults to them; evidence that S.L. had behavioral problems and that Gilbreath interfered with her dating life; evidence that S.L. said in her 2008 first disclosure interview that the touching occurred only over her clothing and that she said nothing at that time about the three specific assaults that she described at trial; testimony by Aaron, Giovanni, Kayla and Haiden challenging S.L.'s credibility; testimony from family members regarding S.L.'s motive to lie in 2008 and regarding her behavioral problems and motives in 2010 at the time of the second disclosure; and evidence that undermined S.L.'s claim at trial that she did not recall sending certain letters to Gilbreath when he was in prison. The court of appeals held that none of this omitted evidence warranted a new trial on the statutory claim.

Turning to the claim that counsel was ineffective for failing to investigate and present certain impeachment evidence, the

court of appeals concluded that Gilbreath suffered no prejudice from counsel's decisions because all of the evidence that he wanted counsel to present was merely cumulative and would not have changed the outcome of the trial. In a footnote, the appellate court also concluded that counsel's performance was not deficient, summarily affirming the decision of the post-conviction court as being consistent with the record and the law. In addition, the court found that after causing S.L. to "kind of self-destruct" on the stand, "counsel's decision to stop impeachment when he did, and not to call additional witnesses to further impeach S.L. 'on the same topic,' was a reasonable trial strategy under the circumstances, because trial counsel could reasonably have determined that doing otherwise would have weakened Gilbreath's case." *State v. Gilbreath*, 2018 WL 2347126, *4 n.5 (Wis. Ct. App. May 24, 2018).

After the Wisconsin Supreme Court denied Gilbreath's petition for review, he brought his federal *habeas* petition, which the district court granted. *Gilbreath v. Winkleski*, 476 F. Supp. 3d 804 (W.D. Wis. 2020). Because our review of that decision is *de novo*, we will only briefly sketch the district court's ruling. The court found that counsel was ineffective and that the state appellate court's decision affirming the conviction was unreasonable. The court focused on counsel's alleged failures to investigate and present evidence that could have corroborated Gilbreath's testimony, further undermined S.L.'s credibility, and provided a motive for S.L. to lie at the time of her first disclosure in 2008. The court found that the failure to present certain evidence was due not to strategic decisions during trial but to a failure to investigate before trial. The court found counsel's explanations for why he made

certain decisions "not plausible" and concluded that many of counsel's decisions not to impeach S.L. with prior inconsistent statements were based on inadvertence or neglect rather than strategy. The court found that these various failures prejudiced Gilbreath because the proposed evidence would have been corroborative, not merely cumulative, and could have changed the outcome in this credibility contest. The court also found that the state court engaged in an unreasonable application of *Strickland* when it applied state rather than federal law in determining that the evidence was merely cumulative instead of corroborative. Under federal law, the evidence would be considered corroborative, according to the district court, and because the case was close, the errors had a "reasonable chance" of affecting the outcome. The district court therefore granted the writ, and the State of Wisconsin now appeals.

## II.

On appeal, the State contends that the Wisconsin Court of Appeals neither unreasonably applied the law as set forth in *Strickland* nor relied on an unreasonable determination of the facts when it concluded that counsel was not deficient and that Gilbreath suffered no prejudice from the failure to present evidence that it determined was cumulative. We review the district court's grant of Gilbreath's *habeas* petition *de novo*. *Goodloe*, 4 F.4th at 448; *Mosley v. Butler*, 762 F.3d 579, 587 (7th Cir. 2014).

Because this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we give great deference to the state court. *Goodloe*, 4 F.4th at 448–49. Where the state court has made a decision on the merits, we may

grant relief only if that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011); *Goodloe*, 4 F.4th at 449. In making out a claim for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). When a claim of ineffective assistance is assessed in the context of a *habeas* proceeding, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. Section 2254:

> preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further.

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03. Because the standards created by *Strickland* and section 2254(d) are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105.

## A.

Gilbreath argues that he was denied the effective assistance of counsel when his trial lawyer failed to: (1) investigate S.L.'s claims that she disclosed the assaults to Aaron and Kayla, neglecting to interview them or present their testimony; (2) impeach S.L.'s testimony denying her motive to lie with her prior statements discussing her behavioral problems and Gilbreath's interference with her dating life; (3) impeach S.L. with inconsistencies between the statements she made in the first disclosure and her testimony at trial, and with her failure to mention at the initial disclosure any of the three specific instances of abuse she testified to at trial; (4) investigate witnesses and present testimony from family members corroborating Gilbreath's version of events and establishing

S.L.'s character for dishonesty; and (5) present evidence regarding S.L.'s motive to lie at the time of the first disclosure or regarding S.L.'s behavioral problems leading up to the second disclosure.[15] To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness, applying a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. *Richter*, 562 U.S. at 104; *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (review of the attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy).

We begin with the question of whether counsel was deficient, and more specifically with the question of whether the state court's application of the *Strickland* standard on

---

[15] As the State of Wisconsin noted in its reply brief, Gilbreath's *habeas* claims have changed over time. At the time of the post-conviction hearing, Gilbreath withdrew multiple claims of deficiency including several that he brings on appeal now. Some of these issues overlapped factually with Gilbreath's statutory "real controversy" claim and so the factual record was developed in the Wisconsin courts. In the interests of simplifying the case, the State elected on appeal to withdraw its claims of procedural default for those issues. However, as the State notes, Gilbreath's withdrawal of those claims in the post-conviction court led the court to not make findings or legal conclusions on those claims in the context of ineffective assistance under *Strickland*. Because the State has essentially waived waiver, we will address these claims on the merits.

deficiency was unreasonable. Gilbreath's trial lawyer, Christopher Van Wagner, testified extensively regarding his trial strategy, and how it affected his decisions throughout the trial. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Gilbreath contends that the state court unreasonably applied *Strickland* by deferring to some of Van Wagner's decisions as strategic when in fact they were based on an incomplete investigation.

We disagree. Van Wagner's explanation of his pre-trial decisions and the application of his strategy as the case unfolded before the jury was, as the trial court remarked in the post-conviction oral ruling, worthy of being "required reading in every law school trial practice class." R. 6-16, at 25. Van Wagner's theory of the defense was that S.L. fabricated the allegations. Fully aware that a young accuser in a sexual abuse case can be perceived sympathetically by the jury, he sought to demonstrate not that she was a liar but rather that she was not a reliable witness:

> [T]he core of the defense was that she's not reliable. Not that she's lying. … [M]y general approach is not to treat a young witness who claims to have been as-saulted … with attack mode but rather with, we need to feel sorry for her but we can't rely on her. That's where I really wanted to be. And sometimes … I'll even say she believes it happened but that

doesn't mean it did, which is to give her emotional
credibility but not factual credibility.

R. 6-15, at 113. As part of this approach, he sought to show
"both the incredulity of or … the unbelievability of her
accusations given the physical layout [of the house] and the
witnesses who were present. And also to show that she had a
number of reasons why she may well have wanted to be out of
the house and be … away from [Gilbreath]." R. 6-15, at 57–58.
As for those latter reasons, he sought to show that she rebelled
against Gilbreath as the disciplinarian and the person who was
blocking her access to boyfriends. He explained that in
attacking the credibility of a witness, he chose which avenues
to use both before trial and as the case unfolded at trial. He
was thus prepared with documentation of S.L.'s prior
statements in case he decided to impeach her on that basis, and
also sought to use the layout of the house combined with "the
incredibly intimate proximity of various witnesses" to the site
of alleged molestation to show that it was highly improbable
that her version of events could have occurred and yet gone
unnoticed by Patricia and Haiden. R. 6-15, at 58.

   He did in fact attempt to impeach S.L. with the different
versions that she had given of Gilbreath's conduct, beginning
with the number of times that she alleged that he assaulted her.
He was successful in showing that she disclaimed the
statement recorded in Oleson's first report that the abuse
occurred only five or six times, and proved up that

inconsistency with the stipulation regarding Oleson's report.[16] But after the difficulty of questioning S.L. on that point, he stayed away from attempting to impeach her with prior inconsistent statements followed by a prove-up for fear that he would be perceived by the jury as "attacking" S.L. by "lock[ing] her in" with "lawyers questions" and saying, "didn't you say this, and didn't you say that." R. 6-15, at 79.

Primarily, though, he did not wish to detract from the extraordinary success he had in impeaching S.L. with the letter she wrote to her counselor:

> By the time she had finished giving her answers about the type written statement for the psycholo gist I didn't feel that there was anything else I should do to give the chance to the State to rehabilitate her credibility because she basically said I didn't write what I wrote. And that was something I could never have expected in trial and this is what I mean about focusing on what the witness is doing and saying. … I thought that by the time she had essentially and unbelievably denied typing the four page statement that she typed and saying the things she had put in there that at that point if there was ever going to be a jury that was going to have a problem with her credibility that was the moment. And then to go into other areas while certainly

---

[16] Van Wagner also explained that he did not wish to have Oleson testify and did not wish to risk admitting her full reports because substantial parts of the reports and Oleson's likely testimony would have been very harmful to Gilbreath's case.

> scorched earth in nature, exhaustive in nature would
> … not discredit but would undercut … the visceral
> impact to the jury.

R. 6-15, at 67. He felt that S.L. had "made herself out to be virtually delirious on the stand or incredible," and that he did not wish to risk detracting from what he felt was Gilbreath's "optimal position in front of the jury" by trying to prove up statements through witnesses who might be hostile to the defense. He had a file marked with S.L.'s prior statements, had them at the ready for cross-examination, and decided as a strategic matter not to prove up certain prior inconsistent statements. R. 6-15, at 63. He described his thought process:

> I knew in my opinion at that time my strategic view
> of the four page type written letter to the therapist
> was it was manna from heaven. It was a piece of
> gold. And … if we were ever going to get an
> acquittal it was going to be a, a fulcrum point. And
> so if you recall in my cross-examination I spent the
> first five to seven minutes … locking into the truth
> and the extent and the detail and the completeness
> and the absolute reliability of that statement without
> asking her about a single piece of its content. My
> intent was to finish my cross with that[.]

R. 6-15, at 72. He then sought to have S.L. affirm the layout of the room and house and the location of the witnesses to show the improbability of her claim that the masturbation incident (among others) had occurred steps away from Patricia and in the same bed as Haiden without them noticing, before returning to the content of the letter. When he began

questioning her about the content, he had not expected that she would begin to deny writing something that minutes earlier she had "been locked into committing that she had written the whole thing." R. 6-15, at 73. This made her appear "delusional" in his view, and at that point, he moved away from individual impeachments so that he could focus on "getting as much of this deluded response out of her." R. 6-15, at 73–74.

In response to questions about various decisions he made during the trial, Van Wagner indicated that, although with the hindsight of knowing that his strategy did not carry the day with the jury he would prefer to have done things differently, he believed at the time that he had made the best possible decisions for Gilbreath's defense. R. 6-15, at 66, 68–69. Counsel's explanation of his trial decisions and strategy at the post-conviction hearing covered approximately seventy pages of transcript, and so far we have sketched out his strategy in only the broadest terms. Although we assess counsel's performance as a whole, we must turn to Gilbreath's particular claims of ineffective assistance and Van Wagner's explanation in each instance before considering the whole.

**1.**

Gilbreath asserts that counsel was ineffective for failing to investigate S.L.'s claims that she contemporaneously disclosed the assaults to Aaron and Kayla, neglecting to interview them or present their testimony. Both Aaron and Kayla would have testified that S.L. never mentioned the assaults to them, impeaching S.L.'s claim that she reported the assaults to them and that they responded supportively. Van Wagner testified that he was aware that S.L. claimed she had disclosed the

assaults to Aaron and Kayla. Van Wagner did not believe that Aaron had anything useful to add to the trial, noting that he preferred to present the two closest eyewitnesses: Haiden, who shared a bed with S.L., and Patricia, who slept a few steps away. Van Wagner thought that a teenaged boy asleep in a bunk bed above S.L.'s futon would not have anything useful to offer. But more importantly, he testified that Aaron was living in Colorado at the time of the trial and was having legal problems of his own. Gilbreath did not want Aaron to return for the trial, and together Van Wagner and Gilbreath decided not to bring Aaron to Wisconsin for the trial. In fact, Aaron was on probation in Colorado and was not allowed to leave the state. As a result of Gilbreath's wishes, counsel's judgment and Aaron's own legal difficulties, Van Wagner spoke to Aaron mostly about whether he could be forced by the State of Wisconsin to return to testify and did not go into detail with him regarding his knowledge of S.L.'s claims. *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). The post-conviction court concluded as a factual matter that Aaron was not available for trial and so gave no weight to any claims that counsel was ineffective for failing to call Aaron for any purpose.[17] Gilbreath offers nothing to counter this factual finding, and we therefore cannot conclude that the state court

---

[17]  At most, Aaron would have testified that he did not witness any abuse, that he believed S.L. to have a character for untruthfulness, and that S.L. did not tell him about the assaults at the time they occurred.

unreasonably applied *Strickland* in declining to find counsel ineffective in relation to Aaron's possible testimony.

As for Kayla, counsel believed that he spoke to all family members who attended the trial, some before and some during the trial. He could not specifically recall talking to Kayla about S.L.'s disclosure claim and he did not consider calling her to impeach S.L. about whether she disclosed the assaults at the time they were occurring. Although he could not recall making a decision specifically about objecting on hearsay grounds to S.L.'s testimony about her purported conversation with Kayla, he explained that his general practice was not to object unless he felt the testimony would hurt the case; he did not wish to give the jury the impression that he was seeking to prevent them from knowing the truth. He assumed from his failure to object that he did not believe at the time that he should. He also explained that he does not cross-examine on every topic, instead limiting himself to things that highlighted the areas most fertile in the case. And as we noted above, he sought not to show that S.L. was a liar but that she was unreliable, a reasonable strategy with a young accuser.

Kayla would have testified that S.L. did not disclose the assaults to her and that she believed S.L. was not a truthful person. In denying the post-conviction motion, the state court credited Van Wagner's testimony that he did not believe that third-party impeachment of S.L. was an effective tactic, and believed at the time of trial that it would have harmed Gilbreath's case for several reasons, including by detracting from what defense counsel had already accomplished. Under *Strickland*, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. Even if a decision not to further investigate Kayla was a mistake, that is not enough to characterize a lawyer's judgment as ineffective assistance. *See Makiel v. Butler*, 782 F.3d 882, 901–02 (7th Cir. 2015) (a miscalculation constitutes deficient performance only where the miscalculation was objectively unreasonable). *See also Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). We cannot say that Van Wagner's decision not to investigate Kayla further in light of what he already knew and in the context of his general strategy was objectively unreasonable. Nor can we say that the state court unreasonably applied *Strickland* in refusing to fault Van Wagner for this choice. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (even if an omission by counsel is inadvertent, relief is not automatic; the Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight). And as we note below, any failure to investigate Kayla further and present her testimony was not prejudicial.

**2.**

Gilbreath next contends that counsel was ineffective for failing to impeach S.L.'s testimony denying her motive to lie with her prior statements discussing her behavioral problems and Gilbreath's interference with her dating. Specifically, he contends that counsel should have impeached S.L. regarding the inconsistency between her claim during the 2008 disclosure that the touching occurred only over her clothes, and her 2010 disclosure where she reported touching under her clothing. But

of course, counsel did ask S.L. about her claim in 2008 that the touching occurred only over her clothing, although he admittedly did not prove up this assertion by presenting Oleson's written report on this point.[18] Nevertheless, counsel explained that the decision not to prove up prior inconsistent statements was a strategic decision he made at the time of the trial. R. 6-15, at 63–64. He did not wish to detract from what he accomplished in showing her to be "virtually delirious" in her testimony about the letter to her therapist, and he generally did not like to impeach with and prove up prior inconsistent statements because such evidence "causes jurors eyes to glaze over and they don't follow it." R. 6-15, at 63. He had difficulty impeaching S.L. regarding the number of times the assaults occurred and decided against pushing the point again. He also held the view that "in general that kind of prove up is a wonderful law school or deposition technique but jurors just don't want to follow it very well. They just tend to lose interest." R. 6-15, at 64–65. Although in hindsight he regretted not proving up the inconsistent statement regarding touching under versus over the clothing, he made a decision at the time not to pursue it and detract from what he believed to be the zenith of the case. That decision was not an objectively unreasonable strategy, and as such, it cannot be characterized as ineffective assistance.

---

[18] Counsel's questioning on the under-versus-over-the-clothing issue was successful enough that the State sought to rehabilitate S.L. on this topic on re-direct examination. R. 6-11, at 218. The jury was instructed that sexual contact either directly or through the clothing qualifies as sexual abuse. R. 6-14, at 154-55.

Gilbreath also argued that counsel should have impeached S.L. regarding her motive to lie in 2010 when she denied that she was getting into trouble at home and denied that her parents objected to her relationship with Robert. Gilbreath lists a number of prior inconsistent statements that counsel could have used to impeach S.L. on these topics. We will not repeat our analysis regarding counsel's strategic decisions generally not to impeach with prior inconsistent statements. We will add only that counsel was of the view that he thoroughly addressed these very topics when he questioned S.L. about the statements she wrote to her therapist, where she referred to herself as a "wild child," and in the testimony of Gilbreath, Patricia and Haiden that S.L. was getting into serious trouble with Gilbreath frequently. He had also addressed the driver's license issue, which he characterized as a "huge deal" to a teenager. But he did not wish to attack her further and risk the jury thinking, "[L]eave her alone for crying out loud. … [T]he poor girl is doing the best she can." R. 6-15, at 78–79.[19] *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) (deciding not to cross-examine a sympathetic victim/witness was well within the realm of sound trial strategy, and we will not, in hindsight, second-guess that decision). When asked about failing to impeach S.L. with her prior statements about her father's dislike of Robert, counsel replied, "My answer is

---

[19]   Counsel also explained that he was very careful to avoid using impeachment materials from the interviews with Oleson and Safe Harbor for fear that the trial court would allow the entire documents be entered into evidence at the State's request for completeness and context. He wished to avoid the entry into evidence of significant amounts of information that would have been adverse to Gilbreath's case.

the same. … I did what I did because I thought it was the best at the time," explaining that he abandoned the idea of paper impeachments or collateral witness impeachments because S.L. had "self-impeached quite well." R. 6-15, at 83. These were not objectively unreasonable decisions.

### 3.

Gilbreath next asserts counsel should have impeached S.L. with her failure to mention in her first disclosure the three specific, more graphic incidents that she described at trial. Asked about his failure to do so during the post-conviction hearing, Van Wagner explained his entire impeachment strategy and his decision to forgo this type of impeachment after he cross-examined S.L. regarding her letter to the therapist. R. 6-15, at 71–77. His explanation, some of which we quoted above, occupied five or six pages of the transcript, and was based on reasonable strategic decisions grounded in the facts of the case and the law, as the state court found, and requires no further analysis.

### 4.

This conclusion applies equally to counsel's decisions not to call Aaron, Giovanni, Kayla, and Kayla's mother Dawn to testify that they observed no sexual touching or suspicious conduct when in the presence of S.L. and Gilbreath, and in the case of the latter three witnesses, that they believed that S.L. had a reputation for untruthfulness. We have already addressed Aaron's unavailability for trial, and need not address this claim further as it relates to him. In the case of Giovanni, counsel testified that no one had suggested to him prior to trial that Giovanni would have something helpful to

say. *See Strickland*, 466 U.S. at 691 (whether investigation decisions are reasonable depends critically on information provided by the defendant). As with Aaron, Giovanni was in a bunk bed above S.L. and was not as direct a witness as Haiden or Patricia. Van Wagner did not believe that having Giovanni testify that he saw nothing would add anything to the testimony of Haiden and Patricia, characterizing his potential contributions as "negligible," especially in comparison to Haiden who shared a bed with S.L. and said she saw nothing. R. 6-15, at 97. Although in hindsight, counsel thought it might have been better to call Aaron and Giovanni, at the time, he decided not to because "teenage boys sleep like rocks. They sleep through anything," and because the jury knew that the children shared the room and yet nobody came forward and told investigators they witnessed anything. R. 6-15, at 98. Giovanni was two years younger than S.L., and so would have been seven years old when the abuse began. It is difficult to say that counsel made an objectively unreasonable decision in deciding not to interview a witness who would have been seven or eight years old and without a direct line of sight to the relevant events. In the end, Giovanni would have said only that he did not see anything amiss and that he believed S.L. to be untruthful. As the state court post-conviction court noted, it was "not particularly surprising" that after the jury believed S.L. and convicted Gilbreath, "family members who sided with the defendant came out of the woodwork to claim" that S.L. was a liar, but this was simply the same evidence the jury had already heard from different voices. R. 6-16, at 19. Counsel's decisions not to have family members pile on with claims that S.L. had a character for

untruthfulness or that they saw nothing amiss was a reasonable strategy at the time of the trial. *See Bergmann*, 65 F.3d at 1380 (as a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias).

**5.**

Finally, Gilbreath argues that counsel was ineffective because he failed to provide evidence of a motive for S.L. to fabricate the first disclosure in 2008, focusing instead on her motives at the time of the second disclosure in 2010. This gap was exploited by the prosecutor in questioning Patricia and in closing argument, according to Gilbreath. In particular, Van Wagner should have presented evidence that, in 2008, S.L. was involved with a friend of Aaron's named Dustin, who was four years older than she, and that Gilbreath interfered with that relationship in the same way he interfered with her relationship with Robert in 2010.

Van Wagner testified that he sought to present a motive that was the same throughout, namely that Gilbreath was a strict disciplinarian against whom S.L. rebelled. He testified that this motive was present "on a lesser scale in 2008 by all accounts that came in," and he did not have much more to present as a motive for the first disclosure in 2008. R. 6-15, at 86. He therefore presented S.L. as having the same motives to lie in 2008 as she had in 2010. He did not bring out evidence regarding Dustin specifically, but he did present evidence that Gilbreath was a strict disciplinarian both before he went to prison and when he came home from prison. Counsel was also wary of the dynamics in the courtroom during the presentation

of motive evidence because the defense side of the room was full of Gilbreath's relatives, and the other side held just a row and a half of members of S.L.'s foster family and someone from a support agency. He did not wish to get into an "internecin[e] family battle," and did not have more evidence to add beyond the discipline evidence for a 2008 motive to lie. R. 6-15, at 85.

Van Wagner's explanation of his handling of the 2008 motive to lie evidence is consistent with the testimony of both Gilbreath and Patricia at trial and at the post-conviction hearing. Both Patricia and Gilbreath professed not to know why S.L. would lie in 2008, R. 6-12, at 52 and R. 6-13 at 92, and Gilbreath testified that he did not understand that there was an issue with Dustin until after he was released from prison. R. 6-15, at 185. Gilbreath thus did not seek to limit S.L.'s relationship with Dustin until some time after his release, and in fact testified at trial that he did not really have problems with S.L.'s behavior before he went to prison. R. 6-15, at 185–87; R. 6-13, at 90. Moreover, S.L.'s first disclosure came before Gilbreath's release, and so the timeline did not support using her relationship with Dustin as a motive for lying about Gilbreath.

Gilbreath also faults Van Wagner for failing to present specific instances of S.L.'s behavioral issues in the 2010 time frame in order to show her motive to lie. This evidence included S.L. writing a note at school critical of Gilbreath for telling her what to do when he was not her father; lying to Gilbreath about her self-inflicted wounds; lying about staying late at school for a school project when she was in fact meeting up with a boyfriend; and arguing with Gilbreath about her desire to take a two-week trip with Robert. But Van Wagner

explained several times why he decided not to impeach S.L. with this type of evidence, and although he may have felt in hindsight that it would have been better or more prudent to employ this type of evidence, he repeatedly reaffirmed that he made the best decisions he could for Gilbreath at the time based on his judgment of how the trial was unfolding. Most importantly, he had placed before the jury S.L.'s own descriptions of her behavioral issues in the letter to her therapist. Once again, Van Wagner's reasons for declining to present his type of evidence were the result of objectively reasonable strategic decisions supported by the facts and the law, and Gilbreath cannot show that the state court misapplied *Strickland* on this point. *Yarborough*, 540 U.S. at 9 ("The issues counsel omitted were not so clearly more persuasive than those he discussed that their omission can only be attributed to a professional error of constitutional magnitude."); *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (*Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable); *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011) (so long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel).

In sum, a petitioner's burden in making a claim of ineffective assistance is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The state court did not unreasonably apply this standard in concluding that Gilbreath fell short of that mark.

**B.**

Gilbreath failed to demonstrate that the state court's rejection of a claim of deficient performance was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. That conclusion is sufficient to end this appeal, but for the sake of completeness, we turn to the question of prejudice, the second major prong of the *Strickland* analysis:

> With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Richter*, 562 U.S. at 104 (internal citations and quotation marks omitted). Again, because we consider Gilbreath's *Strickland* challenge in the context of a petition for a writ of *habeas corpus*, our review of the state court's decision on prejudice is highly deferential. Gilbreath again falls short of the mark.

The post-conviction court found that counsel's decisions were the result of objectively reasonable strategic decisions except in a single instance related to counsel's failure to notice that an interview with Oleson had been recorded. Gilbreath does not complain of this error on appeal, and in any case, the

court found that it had no basis for concluding that Gilbreath was denied a fair trial with a reliable result as a result of that or any other error. The court of appeals also concluded there were no prejudicial errors in trial counsel's performance:

> The matters that Gilbreath argues trial counsel should have investigated and used to impeach S.L. are the same matters we have discussed above [in rejecting Gilbreath's claim under Wis. Stat. § 752.35 that the real controversy was not fully tried]. We have explained, however, that S.L.'s credibility was thoroughly impeached at trial and the new impeachment material would be merely cumulative. Therefore, there could be no prejudice to Gilbreath as a result of counsel's alleged deficient performance, because the result of a new trial would be the same.

*State v. Gilbreath*, 2018 WL 2347126, *4 (Wis. Ct. App. May 24, 2018).

Gilbreath takes issue with the court's characterization of the additional impeachment material and other evidence as "cumulative," contending that the evidence was actually corroborative, and maintaining that the court wrongly applied state rather than federal law in making that judgment. *See State v. Gilbreath*, 2018 WL 2347126, *3 (citing *State v. McAlister*, 911 N.W.2d 77 (Wis. 2018)). Gilbreath objects to this application of *McAlister* because that case involved a claim of newly discovered evidence in the context of a motion for a new trial, rather than a claim for ineffective assistance of counsel. But the language he objects to in the court's opinion is contained in the

analysis of his state law claim for a new trial in the interest of justice where the real controversy was not tried. True, the court of appeals referred back to that analysis when it assessed the prejudice prong of the *Strickland* claim, but the court's point was subtly different: in the *Strickland* analysis, the court found that S.L. had been so thoroughly impeached that additional impeachment evidence would not likely have affected the outcome of the trial.

It does not matter whether the additional impeachment evidence is characterized as cumulative or corroborative; neither of the state courts found that there was a reasonable probability that, but for the omission of this evidence, the result of the proceeding would have been different. Indeed, counsel managed to place before the jury at least three different versions of the abuse that S.L. reported to authorities, social workers and her counselor, using her own words to demonstrate the inconsistencies. As the post-conviction court noted, counsel thoroughly succeeded in discrediting S.L.'s reliability as a witness with the cross-examination on the letter to her counselor; and counsel reasonably decided that additional evidence demonstrating unreliability or untruthfulness would have hurt rather than helped his case. The court agreed with counsel's assessment. Gilbreath does not explain how the conclusion of the state court that there is not a reasonable probability that the result would have been altered by this additional evidence results from an unreasonable application of federal law.

Gilbreath contends, nevertheless, that counsel's failure to impeach S.L. on the same points we have already covered would have caused the jury to reassess her credibility.

According to Gilbreath, the case was close, and the Wisconsin court failed to assess the missing evidence in light of the strengths and weaknesses of the State's case. Evidence of his guilt was weak, Gilbreath asserts, and in a close case, the additional evidence would have made a difference to the outcome. As we noted above, the post-conviction court also presided over the original trial, and that judge concluded that there was no reasonable probability that, but for any error by counsel, the result would have been different. In our assessment of prejudice when the same judge presided over both the trial and the post-conviction hearing, "we cannot accept as conclusive the judge's statement that the new evidence would not have made any difference to the outcome of the case." *Raygoza v. Hulick* 474 F.3d 958, 964 (7th Cir. 2007). Nevertheless, "we naturally give great weight to the judge's assessments, particularly on matters relating to the credibility of the witnesses who appeared." *Id*.

At base, Gilbreath's argument is that, in a credibility contest, counsel must employ scorched-earth tactics in attacking the credibility of the primary witness. But this argument gives no consideration to the risks of such a strategy. As trial counsel was well aware, there are significant downsides to attacking a sympathetic young accuser or even being perceived as attacking her. In this instance, the accuser had been abandoned by her entire family after disclosing the abuse, and the courtroom was full of the defendant's supporters. Counsel was fully aware of the tensions in the courtroom when he decided not to call additional witnesses or further impeach S.L. after he successfully impeached her with her own words in front of the jury, where she first took ownership of the letter

to her therapist and then denied that she wrote the most significant parts of it, including substantial material that contradicted her testimony at trial on the very issues Gilbreath asserts were insufficiently challenged. In addition to the potential upside of the additional evidence, counsel and the Wisconsin courts noted that there were also significant risks and downsides, and Gilbreath's arguments acknowledge none of those downsides. The judgments of the Wisconsin courts on prejudice are due deference.

Finally, although Gilbreath faults the Wisconsin court for failing to consider the additional evidence in the context of the totality of the evidence before the jury, he fails to consider the effect of his own testimony as the only witness presented in the defense case. Gilbreath's counsel, in attempting to make sense of the jury's verdict, remarked that he was stunned by the verdict:

> [W]hat I did in this case didn't work and it should've. It should've based on my eighty to ninety trials including twenty sexual assault trials on both sides.

R. 6-15, at 115–16. In the end, counsel concluded, "if you ask me I'd say I think the jury just said we don't believe Michael." R. 6-15, at 117. Gilbreath fails to take into account that his testimony was the other half of the credibility contest, and his own lawyer believed that the jury simply did not believe his client even though the trial strategy he employed should have worked based on his extensive trial experience in sexual assault cases.

Even if we ourselves were persuaded that Gilbreath had been prejudiced by his lawyer's lapses (and again, there were no significant lapses), "a state court's determination that a defendant was not prejudiced by his lawyer's ineffectiveness is entitled to great weight in a federal habeas corpus proceeding." *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). We cannot conclude in the end that the state court's ruling on prejudice was the result of an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

## III.

In granting the writ, the district court did not defer sufficiently to counsel and the state courts:

> [T]he *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052[.]

*Richter*, 562 U.S. at 105. In this case, experienced counsel carefully decided when to press forward and when to hold

back in light of a carefully constructed strategy that took into consideration everything from the sympathetic nature of the accuser to the mood in the courtroom. As Van Wagner perceived the case unfold and reached what he believed was the "zenith of … the strength of our case," a "fulcrum point" that gave his client the best chance for an acquittal, he consciously resolved not to present the very evidence that Gilbreath argues he should have presented. We cannot say that the Wisconsin Court of Appeals unreasonably applied *Strickland* when it determined that counsel's performance was neither constitutionally deficient nor prejudicial. We therefore reverse the judgment granting the writ.

REVERSED.